## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ENRICO PERRAGLIO,

      Plaintiff,

v.                                       CV 08-0351 WPL/RHS

STATE OF NEW MEXICO, DEPARTMENT
OF GAME AND FISH; AND LAURA
ROMERO, IN HER INDIVIDUAL AND
OFFICIAL CAPACITY,

      Defendants.

## ORDER

After being fired from his job with the Department of Game and Fish of the State of New Mexico, Enrico Perraglio sued the Department and his former supervisor, Laura Romero, asserting several causes of action. The Department has moved for summary judgment in its favor. In response, Perraglio concedes all of his claims except his cause of action for reverse discrimination under Title VII of the Civil Rights Act of 1964. (*See* Doc. 61 at 1 n.1.) Having considered the memorandum in support of the Department's motion, related briefing, and the evidence, I will grant summary judgment for the reasons explained below.

### APPLICABLE LAW

In a summary judgment proceeding, all reasonable inferences must be drawn in favor of the nonmoving party. *Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1145 (10th Cir. 2008). Summary judgment is appropriate if the evidence, viewed through this prism, raises "no genuine issue as to any material fact." FED. R. CIV. P. 56(c). A fact is "material" if it could have an effect on the outcome of the lawsuit under the applicable law. *Adamson*, 514 F.3d at 1145 (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.*

The moving party bears the burden of showing that no genuine issue of material fact exists. *Id.*  But when the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its summary judgment burden by showing that the nonmoving party lacks evidence regarding an essential element of his claim.  *Id.*

Generally, to prevail on a claim of discrimination under Title VII, a plaintiff must first establish a "prima facie case."  *Notari v. Denver Water Dep't*, 971 F.2d 585, 588 (10th Cir. 1992) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  In a reverse discrimination case, a plaintiff may establish a prima facie case by relying on a version of a four-part test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*.  Among other things, this test requires a reverse discrimination plaintiff to show "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."  *Id.* at 589; *see also Plotke v. White*, 405 F.3d 1092, 1099-1100 (10th Cir. 2005) (describing how a plaintiff might satisfy the other three parts of the test in a wrongful discharge case).  Alternatively, the plaintiff may rely on direct evidence of discrimination or indirect evidence sufficient to support a reasonable probability that but for his gender, the challenged employment decision would not have occurred.  *Notari*, 971 F.2d at 590.

Perragio expressly disclaims reliance on background circumstances to support an inference that the Department is one of those unusual employers who discriminate against the majority.  (*See* Doc. 61 at 7 n.4.)  Accordingly, the pertinent question is whether Perraglio has demonstrated a genuine issue of material fact under the alternative theory so as to survive summary judgment.  In

2

other words, is there some direct evidence of discrimination or indirect evidence sufficient to support a reasonable probability that but for his gender, Perraglio would not have been fired?

Title VII also makes it unlawful for gender to play a motivating factor in any employment decision, even if other factors also motivated the decision.  *See* 42 U.S.C. § 2000e-2(m).  Although the Tenth Circuit has not yet ruled on this question, the Sixth Circuit has held that when a plaintiff relies on a mixed-motive theory, the *McDonnell Douglas* framework does not apply.  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008); *Furaus v. Citadel Commc'ns*, 168 F. App'x 257, 260 (10th Cir. 2006) (finding it unnecessary to decide whether *McDonnell Douglas* applies in a mixed-motive case because the plaintiff did not preserve that argument).  In the Sixth Circuit, a plaintiff who asserts a mixed-motive claim may survive a summary judgment motion by producing evidence sufficient to convince a jury that the defendant took an adverse employment action against the plaintiff and that race, color, religion, sex, or national origin was a motivating factor for the defendant's action.  *White*, 533 F.3d at 400.  In his response to the summary judgment motion, Perraglio makes a mixed-motive argument and cites *White*.  For purposes of ruling on the summary judgment motion, I will assume that the Tenth Circuit would follow *White*.

### RELEVANT FACTS[1]

In October 2004, Laura Romero (hereafter "Supervisor Romero") and another supervisor interviewed Perraglio for a temporary  position that was to last ninety days.  Perraglio got the job and experienced no problems with Supervisor Romero during the ninety-day term of the position.

---

[1] Except as otherwise noted, the facts recited here were taken from the statements of undisputed facts set forth in the Department's memorandum in support of its motion and in Perraglio's response.  (*See* Doc. 52 at 2-5; Doc. 61 at 1-6.)

Perraglio was then hired for a second ninety-day position. Supervisor Romero was out of the office on maternity leave during much of the second ninety-day period.

In June 2005, Perraglio was hired for the classified (non-temporary) position of financial specialist at the Special Hunts Division. Initially, Perraglio and Supervisor Romero were the only people working in the Special Hunts Division. During this time, Perraglio complained to Supervisor Romero's boss that she was taking excessively long breaks to pump breast milk and that she was taking the breaks at particularly busy times.

The Department hired a new temporary employee, Lora Romero (hereafter "Lora the Temp"), to help in the Special Hunts Division. After Lora the Temp was hired, Perraglio placed a tape recorder on the counter of his workstation. On September 28, 2005, it captured a conversation between Lora the Temp and Supervisor Romero. (Doc. 49.) During the conversation, one of the women indicated that an employee (presumably Perraglio) told her he was thinking about quitting. She said, "If he wants to quit, let him quit" and "I would be better off." The same woman seems to mention applicants for another job. She says something like, "He doesn't want another woman . . . here" and she was "not supposed to talk about this," but there are two people "in the top" and she was "tempted go with the female just because of that." (Doc. 58 at 1-2.) On October 3, 2005, the Department offered a job in the Special Hunts division to a woman. (Doc. 61 Ex. 3 at 82-83.)

On September 29, 2005, Perraglio submitted a written complaint about Lora the Temp to Supervisor Romero. (*See* Doc. 61 Ex. 1 at 186.) The written complaint described a personality conflict between Perraglio and Lora the Temp, but did not mention any gender discrimination. Perraglio claims that he overheard Supervisor Romero offer to help Lora the Temp prepare a rebuttal to the complaint. (*Id.* at 186-87.) In her rebuttal, Lora the Temp alleged that Perraglio had made "sexually aggressive comments." (Doc. 67.) She claimed that he and one of his friends talked about

"sexual situations" and listened to "explicit CD's." (*Id.*)  He also told another employee, "She's cute, I would hit that" in reference to a customer.  (*Id.*)  Additionally, Lora the Temp claimed that she heard Perraglio say, "I guess I would hit that" as she walked by him and a group of other male employees.  (*Id.*)  Perraglio denies making these comments.

The Department's Human Resource Director, Shirley Baker, investigated Lora the Temp's allegations.  She interviewed the men who were present when Perraglio allegedly made the sexual comments.  None of them substantiated Lora the Temp's allegations.  They all said that they had never heard Perraglio make sexually inappropriate comments.   (Doc. 61 Ex. 3 at 36-37.)  Baker "suspect[ed] that the gentlemen . . . may have dismissed a comment that was said in passing as just guy talk and didn't remember it."  (*Id.* at 38.)  She believed that all of the men were capable of making similar comments.  (*Id.* at 38-39.)

On October 3, 2005, Supervisor Romero gave Perraglio a written warning regarding his work performance.  (Doc. 52 Ex. D (Ex. 8 to Perraglio Dep.).)  The warning documented several concerns with Perraglio's performance: 1) questioning Supervisor Romero's authority; 2) failing to do his own work; 3) not being diligent in his time reporting and failing to get approval for working overtime; 4) complaining to customers; 5) having a negative attitude; 6) being bossy (based on reports from his co-workers); and 7) making inappropriate sexual comments.  Specific examples of some of the conduct documented in the warning were provided.  Supervisor Romero requested in the warning that Perraglio initial the warning to confirm that they had discussed the issues therein.  Although Perraglio only placed his initials next to the first and third items, he acknowledged in his deposition that he and Supervisor Romero discussed all of the items in the warning.  (Doc. 61 Ex. 1 at 133-34.)

Perraglio's testimony about the significance of his initials is a bit hard to follow.  He first stated, "I initialed the ones that I thought were pertinent, and the ones I did not, I did not initial." (*Id.* at 132.)  When asked if his initials signified his acknowledgement that he needed to improve in the ways discussed in the first and third items, he replied, "Not necessarily that I needed to improve, but that had transpired, that, yes, we had had those discussions because that is the way she addressed it to me, that we had had those discussions and I needed to be aware of them."  (*Id.* at 134.)  When asked if he initialed the first and third items because he "agreed with what was being said there," Perraglio replied, "I initialed them because I felt, yes, that was what had transpired as far as me needing to submit an e-mail for her to give me credit for my comp time."  (*Id.* at 133.)  He explained that the third item "was due to the fact that I had worked some overtime and forgot to submit the e-mail to her at the time I had left that evening . . . ."  (*Id.* at 135.)  However, he denied that he was required to get prior approval before working overtime.  (*Id.* at 135-36.)  Perraglio also denied that he was ever argumentative.  (*Id.* at 134.)

On October 6, 2005, Supervisor Romero drafted a memorandum that referenced the third item in the October 3 warning.  The October 6 memorandum stated that although Perraglio called in sick on September 30, 2005, he "submitted hours that reflected 8 hours of regular time worked for this date."  (Doc. 52 Ex. D (Ex. 9 to Perraglio Dep.).)  The memorandum directed Perraglio to "make a better effort to keep track of your hours."  (*Id.*)

Perraglio claims that Supervisor Romero did not give him the October 6 memorandum.  He did not even know about the memorandum until he found it in a copy of his personnel file, which he requested and received after his termination.  (Doc. 61 Ex. 1 at 156.)  At the time of her deposition, Supervisor Romero did not remember writing either the October 3 warning or the

October 6 memorandum, nor did she remember many of the issues raised in those documents.  (Doc. 61 Ex. 2 at 59-72.)[2]

Supervisor Romero claimed that she heard Perraglio make sexual comments before Lora the Temp made her allegations.  She testified that she heard Perraglio make a comment about a female employee having "nice breasts" and another having "tight little buns."  (Doc. 52 Ex. E. at 52.)

As part of her investigation of Lora the Temp's allegations, Baker interviewed Supervisor Romero on October 12, 2005.  (Doc. 61 Ex. 3 at 55.)  During this interview, Supervisor Romero told Baker for the first time about the sexual comments she had heard Perraglio make.  She claimed at the time that she did not know that the Department's sexual harassment policy required her to report these comments.  She also indicated that she was concerned that if Perraglio was fired for making these comments, she would be left without any help in the Special Hunts Division.

Perraglio was fired on October 24, 2005.  (Doc. 61 Ex. 3 at 82.)  In a letter notifying him of his termination, Supervisor Romero stated, "You continue to be argumentative with me, question my authority, talk back to me, refuse to perform duties I ask you to do and make false claims on your time sheet.  In addition, I have heard you make inappropriate comments that were sexual in nature about employees and customers."  (Doc. 52 Ex. D (Ex. 10 to Perraglio Dep.).)  At her deposition, Romero testified that she had no recollection regarding the reasons stated in the termination letter other than her memories related to the earlier warning and memorandum.  (Doc. 61 Ex. 2 at 79.)

---

[2] In his response to the summary judgment motion, Perraglio asserts that except for the allegations regarding sexual comments, Supervisor Romero does not remember the issues set forth in the October 3 warning or the October 6 memorandum.  In her deposition, however, Supervisor Romero gave one example of a time when Perraglio questioned her authority and stated that Perraglio reported inaccurate hours (i.e., reported that he was working when he was not).  (Doc. 61 Ex. 2 at 62-63, 65-67.)  She also recalled Lora the Temp telling her that Perraglio was "extremely bossy."  (*Id.* at 43.)

The decision to terminate Perraglio was reviewed and approved by Baker as well as the Department's general counsel.  His position was eventually filled by a woman.  (Doc. 61 Ex. 3 at 82.)

## APPLICATION OF THE LAW TO THE FACTS

### *Direct Evidence*

Perraglio believes that the recording of Supervisor Romero and Lora the Temp contains direct evidence of discrimination.  Specifically, he cites the portion of the recording in which Supervise Romero states "that she was 'tempted' to hire another woman because she (erroneously) thought that [Perraglio] would not work with another wom[a]n and would quit his job."  (Doc. 61 at 8.)  Perraglio points out that my prior order noted that Supervisor Romero's statement seems to suggest improper motives (*see* Doc. 58 at 8), and asserts that "[t]he statement thus constitutes direct evidence of discriminatory motive" (Doc. 61 at 8).

"Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification."  *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997).  The statute makes it "unlawful . . . to discharge any individual . . . because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  Pursuant to this plain language, liability attaches only if the plaintiff was discharged "because of" his gender.

Direct evidence is evidence that proves the existence of a fact without inference or presumption.  *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  Statements of personal opinion, even when reflecting a personal bias, do not constitute direct evidence of discrimination because the trier of fact would have to infer that the bias reflected in the statements was the reason behind the adverse employment decision.  *Id.*

Supervisor Romero's expressed temptation to hire a woman in an effort to make Perraglio resign may be direct evidence of an improper motive for employing the woman who was hired on October 3, 2005.   That does not necessarily mean, however, that it is direct evidence of a discriminatory motive (a motive based on his gender) for firing Perraglio.[3]   When, as in this case, a plaintiff alleges disparate treatment, "liability depends on whether the protected trait . . . actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).   "That is, *the plaintiff's* [gender] must have actually played a role" in the employer's decision. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000) (citing *Hazen Paper Co.*, 507 U.S. at 610) (emphasis added).   In this case, there is nothing in the recorded conversation to suggest that Perraglio's gender played a role in the decision to fire him.   The conversation does not reveal a desire to discharge Perraglio because he is a man.   Rather, it reveals an inclination to hire a woman because of a belief that Perraglio did not want to work with another woman.

Supervisor Romero did not demonstrate a personal bias against men during the recorded conversation.   Although it is clear from the conversation that Supervisor Romero was not fond of Perraglio, there is nothing in the conversation to indicate that she did not like him because he is a man.   Viewed in isolation and in the light most favorable to Perraglio, her statement that she was "tempted to go with the female just because of that" arguably could be construed as a desire to hire a woman because she is personally biased in favor of women and, concomitantly, against men.   But Perraglio himself does not interpret the statement this way.   Perraglio argues that Supervisor Romero wanted to hire a woman "as a means of driving [him] out."   (Doc. 61 at 11.)   This argument

---

[3] The woman hired on October 3, 2005 did not replace Perraglio.   (*See* Doc. 61 Ex. 3 at 82-83.) Indeed, Supervisor Romero's statements during the recorded conversation show that the new employee would be working with, not after, Perraglio.

implicitly acknowledges that Supervisor Romero did not want to hire a woman because she favored women, but because she wanted to be rid of Perraglio.

### *Indirect Evidence*

Perraglio next argues that he has presented sufficient indirect evidence to support a reasonable probability that he would not have been fired but for his gender.  He asserts that the October 3, 2005 warning, the October 6, 2005 memorandum, and the October 24, 2005 termination letter are highly suspect.  He argues that there is no evidence to support the charges in these documents other than the documents themselves.  According to Perraglio, Supervisor Romero remembers nothing about the charges other than the charges regarding sexual comments.

Perraglio contends that the charges regarding sexual comments are dubious at best for several reasons.  First, Supervisor Romero did not immediately take action when she allegedly heard Perraglio make sexual comments.  She did not report the matter until she was interviewed by Baker as part of the investigation of Lora the Temp's similar allegations.  Perraglio views this timing as suspicious, particularly in light of Supervisor Romero's statements to Lora the Temp about hiring a woman to drive him out.  Likewise, he views Lora the Temp's allegations regarding sexual comments as suspicious because she did not make the allegations until after he made a written complaint about her.  Perraglio also believes that Baker's investigation exonerated him because, other than Supervisor Romero and Lora the Temp, the employees interviewed by Baker denied hearing him make sexual comments.  Perraglio asserts that Baker's reason for discounting the recollections of these employees reveals a gender bias on her part.  Furthermore, Baker took no action to remind employees about sexual harassment after finding out about Perraglio's alleged comments even though she testified that such comments are unacceptable and that training about sexual harassment is important.

Perraglio also points to Supervisor Romero's testimony that he and Lora the Temp were "catty" with each other. Supervisor Romero did not recall that one of them was more catty than the other, but instead testified that "they were probably pretty equal." (Doc. 61 Ex. 2 at 42.) Despite their equal "cattiness," Supervisor Romero only took adverse action against Perraglio.

Fianally, referring to the recorded conversation, Perraglio wonders why Supervisor Romero would "conjure a scheme to hire a woman in order to drive [him] out if she had legitimate reasons to terminate" him. (Doc. 61 at 8.)

In analyzing the evidence cited by Perraglio, I first note that the Department has never claimed that it fired Perraglio because he was catty with Lora the Temp. Moreover, Perraglio erroneously asserts that Supervisor Romero only remembers his sexual comments and remembers nothing about the other charges against him. As discussed in footnote two, Supervisor Romero did recall Perraglio questioning her authority and reporting inaccurate hours. She also recalled Lora the Temp telling her that Perraglio was extremely bossy.

Other than his complaint about the lack of corroborating evidence, Perraglio does not explain why the October 3 warning, the October 6 memorandum, and the October 24 termination letter are highly suspect. There is no evidence to suggest a gender-based reason for Supervisor Romero to make up charges against Perraglio. Under these circumstances, the mere lack of corroborating evidence does not render the documents suspect. Although the timing of the allegations regarding sexual comments may be suspect (coming as they did after Perraglio's written complaint against Lora the Temp), there is nothing to suggest a gender-based reason for making up these allegations. Any other reason for making up the charges, such as a desire to "get back" at Perraglio for complaining about Lora the Temp, does not establish liability under Title VII. *See Taken*, 125 F.3d

11

at 1370 (pointing out that favoritism and unfair treatment do not violate Title VII unless based on a prohibited classification).

In *Taken*, two white men claimed that they were not selected for a promotion that was awarded to Tansy Preston, an unqualified black woman, because she was romantically involved with a black man who served on the promotion committee. *Id.* at 1368. The plaintiffs alleged that the black man exhibited a racial motivation for promoting Preston by saying that "someone has to look after these black girls," and that a lesser position than the one she was given "would not be a promotion for Tansy." *Id.* at 1369. The Tenth Circuit held that this was not sufficient evidence to support a reasonable probability that the plaintiffs would have been promoted if they were black. The court stated that the plaintiffs had to show that there was a nexus between the allegedly discriminatory statements and the decision not to promote them. The plaintiffs failed to make this showing because the statements did not refer to the plaintiffs or to the challenged promotion decision. The evidence did not support an inference that but for the plaintiffs' status as whites one of them would have been promoted. *Id.*

The plaintiffs' evidence in *Taken* was deemed insufficient, yet it was stronger than the evidence put forth by Perraglio. The statement that someone needed to look after the "black girls" could imply a racial motivation in the promotion decision. The other statement could imply that it was more important to promote Tansy Preston than to find the best person for the job. In this case, there is absolutely no evidence that Supervisor Romero's decision to fire Perraglio was motivated by gender bias. The only evidence indicating that Supervisor Romero ever considered gender is her stated temptation to hire a woman to drive Perraglio away and the subsequent hiring of a woman for that position. As in *Taken*, there is no nexus between this evidence and the decision to fire Perraglio because Supervisor Romero's statement did not refer to the termination decision.

12

There is also no evidence of a gender-based motivation on behalf of the other participants in the termination decision.  Perraglio points to Baker's testimony that "the gentlemen [she] interviewed may have dismissed a comment that was said in passing as just guy talk and didn't remember it" and that any one of the men could have made such a comment.  (Doc. 61 Ex. 3 at 38-39.)  Perraglio argues that this testimony suggests a gender bias.  However, other testimony, ignored by Perraglio, puts these comments in context.  After Baker testified that she believed any of the men could have made the comments attributed to Perraglio, she was asked if she had any information to support that belief.  Baker replied, "I believe that my knowledge of the personalities of the gentlemen that were involved were capable of making comments [sic] that could be of a sexual nature about women."  (*Id.* at 39.)  When asked what knowledge she based this conclusion on, Baker replied, "They are a group of gentlemen who kid around a lot, who hang out together a lot, and as admitted that they even in the mailroom will kid and joke, but it never went outside of there."  (*Id.*)

The Second Circuit has held, "When employment decisions are based on invidious sex stereotypes, a reasonable jury could infer the existence of discriminatory intent."  *Sassaman v. Gamache*, 566 F.3d 307, 313 (2d Cir. 2009).  In *Sassaman*, the plaintiff was forced to resign due to allegations of sexual harassment.  The person who gave him the choice of being fired or resigning told the plaintiff, "[Y]ou probably did what she said you did because you're male . . . ."  *Id.* at 311.  The court held that a reasonable jury could construe this comment as evidence of an invidious sex stereotype—the propensity of men, as a group, to commit sexual harassment.  *Id.* at 312-13.

Baker's testimony is distinguishable from the comment at issue in *Sassaman*.  Baker did not express a belief that all men tend to make inappropriate sexual comments.  Her opinion was based on her own personal knowledge of the men she interviewed.  She believed that those men were capable of making the comments attributed to Perraglio based on what she knew about them, not

based on assumptions about men in general.  Perraglio cannot use Baker's testimony to "convert a borderline sexual harassment case against himself into a sexual discrimination case" against the Department.  *Jones v. Intermountain Power Project*, 794 F.2d 546, 555 (10th Cir. 1986), *overruled on other grounds by Yellow Freight Sys. v. Donnelly*, 494 U.S. 820 (1990).

### *Mixed Motives*

Perraglio's last theory is that gender was at least a motivating factor for his termination.  His entire argument under this theory is the following:

> Supervisor's statement about hiring another female as a means of driving Plaintiff out establishes that gender was a motivating factor for her decision. Additionally, the facts regarding Temp's and Supervisor's allegations of inappropriate sexual comments establish that gender was a motivating factor, particularly where Baker discounted evidence in favor of Plaintiff based on her questionable and stereotyped assumption about that evidence.  At the least, Plaintiff has presented evidence to establish a mixed-motive case.  (Doc. 61 at 11.)

I have already considered this evidence in addressing Perraglio's arguments regarding direct and indirect evidence.  As explained above, nothing in Supervisor Romero's statements during the recorded conversation, in the facts surrounding the allegations of sexual comments, or in Baker's investigation suggests that gender was a motivating factor in Perraglio's discharge.

### CONCLUSION

Perraglio has not presented any direct evidence of discrimination.  He has not presented sufficient indirect evidence to support a reasonable probability that he would not have been fired but for his gender.  And he has not presented any evidence that his gender was a motivating factor in the decision to fire him.  Therefore, the Department is entitled to summary judgment on the reverse discrimination claim stated in the first count of Perraglio's complaint.  The Department is entitled to summary judgment on the remaining counts of the complaint because Perraglio concedes the claims stated there.

14

Perraglio also brought this suit against Laura Romero in her individual and official capacities. From reading the complaint, it is not clear which counts Perraglio intended to assert against Supervisor Romero. The complaint refers generically and singularly to "Defendant." Although the complaint is ambiguous, the law is clear that "personal capacity suits against individual supervisors are inappropriate under Title VII." *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996). A supervisor may be sued under Title VII in her official capacity, but only as a way of suing the employer. When the employer is already subject to suit directly in its own name, "this procedural mechanism is superfluous." *Lewis v. Four B Corp.*, 211 F. App'x 663, 665 n.2 (10th Cir. 2005). Accordingly, I construe the first count of the complaint to be against the Department only. Since Perraglio concedes the remainder of his claims, the entire suit will be dismissed with prejudice.[4]

      IT IS SO ORDERED.

William P. Lynch

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

---

[4] The Department asserts that Supervisor Romero "was never served with the complaint and is formally not a party defendant." (Doc. 52 at 12.) I note, however, that the Department's counsel previously filed a motion in limine on behalf of "Defendants, State of New Mexico, Department of Game and Fish and Laura Romero by and through their attorneys of record . . . ." (Doc. 44 at 1.)

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

15